RAWHOUSER, Appellant, v. COOPERATIVE EDUCATIONAL SERVICE AGENCY No. 4, and others, Respondents.

*No. 75–93. Argued November 30, 1976.—Decided January 6, 1977.*
(Also reported in 248 N. W. 2d 442.)

For the appellant there were briefs and oral argument by *Wayne Schwartzman,* staff counsel, Wisconsin Education Association Council, of Madison.

For the respondents there was a brief by *Edward J. Coe* and *Coe, Dalrymple & Heathman, S. C.* and oral argument by *Edward J. Coe,* all of Rice Lake.

CONNOR T. HANSEN, J. Before considering the issues presented on this appeal and the particular facts as they relate to the issues, we briefly review the organizational structure of cooperative educational service agencies, and in particular, Cooperative Educational Service Agency No. 4. CESA No. 4 is a state agency organized and operating under the provisions of ch. 116, Wisconsin statutes. CESA No. 4 is one of 19 such agencies statewide, created under subchapter 11 of ch. 39, Stats. 1963, and designed to serve the special educational needs of school districts in Wisconsin by cooperatively providing to teachers, students, school boards, adminis-

trators and others, special educational services including such programs as research, special student classes, data collection, processing and dissemination, in-service programs and liaison between the state and local school districts. Sec. 116.01, Stats. Inherent in the legislative action creating the 19 CESA's was the realization that some school districts were not able to or did not desire to employ special education teachers on a full time basis. The cooperative structures within specific geographical areas were created to share the costs and administration of providing such services.

Procedurally, the various CESA's make available special educational services and personnel to member school districts on a demand basis. If a school district requests a given service, within the context of the CESA's providing authority, the district will contract with the CESA for that service; the CESA will hire the appropriate personnel; and the district will be charged a proportionate share of the cost, prorated among all of the districts which utilize that particular service.

CESA No. 4 is governed by an 11 member board of control (hereinafter Board), elected annually from delegate school board members from the 26 school districts comprising CESA No. 4. Sec. 116.02, Stats. The Board is charged with the management and control of CESA No. 4 in accordance with the provisions of sec. 116.03, Stats.

Louis H. Bethke (hereinafter Bethke) was at all times material hereto the coordinator of CESA No. 4, responsible for the administration of the affairs of CESA No. 4 and for implementing the policies of the Board under the provisions of sec. 116.04, Stats.

CESA No. 4, the Board, and Bethke are the respondents in this action.

The trial court found that CESA No. 4 did not comply with the provisions of sec. 118.22(3), Stats., in its non-

renewal of Rawhouser's contract of employment. It also entered judgment quashing the alternative writ of mandamus. In doing so, the trial court found that sec. 116.03 (4) provides that cooperative educational service agencies may not levy any taxes; that the same section also provides that, "No cost may be assessed against a unit [school district] for a co-operative program unless the unit enters into a contract for such service."; and that cooperative educational service agencies have but two sources of income. One is a designated amount of state aid under sec. 116.08, which can only be used for administrative expenses; the other is income from the school districts for services provided under contract. Thus, concluded the trial court, a public body should not be ordered to pay money unless it is made clear to the court that the public body has the money necessary to comply with the order. *Silgen v. Fond du Lac,* 225 Wis. 335, 274 N.W. 256 (1937).

We affirm the judgment of the trial court. We are not in complete accord, however, with the trial court's interpretation of the holding in *Silgen, supra,* and our affirmance is based upon different reasons.

Sec. 118.22, Stats., governs the renewal of teachers' contracts in this state. There is no dispute that Rawhouser falls within the definition of "Teacher" as set forth in sec. 118.22(1) (a), nor that the board of control of CESA No. 4 falls within the definition of "Board" as set forth in sec. 118.22(1) (b). Thus, CESA No. 4 is governed by the provisions of sec. 118.22 in its renewal or non-renewal of teachers employed by it.

Sections 118.22(2) and (3), Stats., provide:

"*(2)* On or before March 15 of the school year during which a teacher holds a contract, the board by which the teacher is employed or an employe at the direction of the board shall give the teacher written notice of renewal or refusal to renew his contract for the ensuing school year. If no such notice is given on or before March 15,

the contract then in force shall continue for the ensuing school year. A teacher who receives a notice of renewal of contract for the ensuing school year, or a teacher who does not receive a notice of renewal or refusal to renew his contract for the ensuing school year on or before March 15, shall accept or reject in writing such contract not later than the following April 15. No teacher may be employed or dismissed except by a majority vote of the full membership of the board. Nothing in this section prevents the modification or termination of a contract by mutual agreement of the teacher and the board. No such board may enter into a contract of employment with a teacher for any period of time as to which the teacher is then under a contract of employment with another board.

"*(3)* At least 15 days prior to giving written notice of refusal to renew a teacher's contract for the ensuing school year, the employing board shall inform the teacher by preliminary notice in writing that the board is considering nonrenewal of the teacher's contract and that, if the teacher files a request therefor with the board within 5 days after receiving the preliminary notice, the teacher has the right to a private conference with the board prior to being given written notice of refusal to renew his contract."

Rawhouser was employed as a social worker by CESA No. 4 continuously from November, 1966, to the end of 1973–74 school year. During those years, his contracts of employment were often issued in the late spring or summer at a time when he knew and understood that CESA No. 4 had already negotiated contracts with some of the school districts for his services. In the 1973–74 school year, he did social work for three of the school districts. At all times, including the 1974–75 school year at issue, Rawhouser knew that if CESA No. 4 was able to get support contracts from the schools in the district, he in turn would receive a contract of employment.

CESA No. 4 was unable to produce support contracts from the school districts for the services of Rawhouser as a social worker for the school year of 1974–75 and

hence he was not issued a contract of employment. This situation brought about the present litigation.

On February 11, 1974, the Board held a special meeting at which Norman Larson, consultant from the department of public instruction appeared. In response to questions from the Board, at that meeting or shortly thereafter, Larson notified the Board that it should follow the provisions of sec. 118.22, Stats., as it pertained to preliminary notice and actual non-renewal of contracts. Prior to that time the Board had not been complying with sec. 118.22. In light of the fact that CESA No. 4 could not contract with its own employees until the member school districts had contracted with CESA No. 4, the prior practice, because of the time constraints imposed by sec. 118.22, had been merely to inform the employees that contractual proceedings with member school districts were progressing and that personal contracts would issue as soon as possible if the underlying supportive contracts were acquired.

Pursuant to a motion passed at the February 11, 1974, Board meeting, Bethke was directed to send preliminary notices of possible contract non-renewal to each employee whose services had not yet been contracted for by member school districts.

On February 22, 1974, Rawhouser received a written preliminary notice of possible non-renewal from Bethke. The notice advised him that Bethke was not then able to issue a contract for the 1974–75 school year because CESA No. 4 had not yet executed service contracts with participating school districts for his services. The letter further indicated that CESA No. 4 was continuing to complete all contractual arrangements relating to Rawhouser's services so that the employment contract with Rawhouser could be issued at a later date.

The February 22, 1974, letter stated in part:

"The Board of Control authorized the issuance of this preliminary notice of possible nonrenewal at its February 11, 1974 meeting. The notice is pursuant to Section 118.22 Wis. Stats. and is for your protection and the preservation of rights and privileges of school districts regarding teacher contracts."

On February 28, 1974, the Board passed a motion to send Rawhouser a written letter or final notice of non-renewal. He was present at that meeting and received the written notice of non-renewal on March 11, 1974. The letter signed by Bethke, indicated that CESA No. 4 was not able to issue Rawhouser an employment contract for the 1974–75 school term and referred Rawhouser to the February 22, 1974, letter regarding CESA No. 4's position on the circumstances.

Both letters were complimentary to Rawhouser and expressed complete satisfaction with his work.

The crucial point in the argument of Rawhouser is that because the February 22, 1974, notice did not specifically inform him of his sec. 118.22(3), Stats., right to a private conference with the Board within five days of the receipt of the notice, which right he claims he would have exercised, a writ of mandamus should issue. He first learned of his right to a private conference with the Board at a union meeting on March 7, 1974. It is his position that because more than five days had elapsed since receipt of the preliminary notice he did not ask for such a conference. It is undisputed that a private conference as provided in sec. 118.22(3), was never at any time, either before or after March 7, 1974, mentioned or suggested by either Rawhouser or the Board.

On the contrary, Rawhouser knew and understood at all times that his work was satisfactory and his employment with CESA No. 4 was dependent upon securing supporting contracts from the member school districts, the same

as it had been since he was first employed in 1966. Also, he knew that because of the necessity of securing supporting contracts it was often late spring or summer before CESA No. 4 issued his contract. The supporting contracts from the school districts for the 1974–75 school year were not forthcoming.

Rawhouser was present at a regular meeting of the Board and stated his case. The record reflects that from the outset he was interested in meeting with the Board and having other people present. Such a meeting took place on March 28, 1974. The Board meeting was moved from the CESA No. 4 offices to Cumberland to accommodate the people Rawhouser had invited to attend. His presentation took about one hour but apparently produced no supporting contracts from the districts. At this meeting, he submitted a letter to the Board stating that he accepted employment with CESA No. 4 for the 1974–75 school term.

On June 3, 1974, Rawhouser wrote to Herbert Byl, chairman of the Board of Control of CESA No. 4, requesting information as to his employment status for the 1974–75 school term. On June 5, 1974, Bethke responded to Rawhouser's letter indicating that it was impossible to answer the question as to whether he would be employed for the 1974–75 school term because contractual proceedings with the member school districts had not been completed. Rawhouser, in fact, was never hired for the 1974–75 school term.

Prior to July 26, 1974, Rawhouser petitioned the circuit court for Barron county for a writ of mandamus to compel CESA No. 4 to tender, recognize and give full legal effect to an employment contract between CESA No. 4 and Rawhouser for the 1974–75 school term. An alternative writ of mandamus was issued by the circuit court on July 26, 1974, and a hearing was subsequently held in the circuit court on September 27, 1974. Both

parties requested a transcript of the testimony and an opportunity to file briefs. The last brief was received by the trial court on December 13, 1974, and on January 23, 1975, the trial court entered judgment quashing the alternative writ of mandamus.

This is not the usual teacher non-renewal contract situation. Rawhouser at all times knew and understood exactly what the situation was. It was the same as it had been since he was first employed by CESA No. 4 in 1966. He knew the renewal of his employment contract was entirely dependent upon CESA No. 4 securing supporting contracts from the school districts. Although his paycheck came from CESA No. 4, it was the member school districts who actually paid it as their proportionate share under the supporting contracts for his services. As the trial judge stated in his opinion, there are two reasons that might prompt a teacher to exercise his right to a private conference, as provided in sec. 118.22(3), Stats. The first is to persuade the Board to renew his contract. The second is that if he is unsuccessful, he would have an opportunity to voluntarily resign.

Under the facts of this case, the first reason is not applicable. The Board was simply unable to employ Rawhouser for the ensuing year unless it had supporting contracts from the school districts, which both he and the Board knew did not exist. The record demonstrates that what Rawhouser actually wanted was a public meeting with the Board and others present, so that he could persuade the school districts to enter into the necessary contracts with CESA No. 4. The Board accommodated him, even to the extent of moving the meeting to Cumberland so that it would be easier for those he had invited to attend. He was given unrestricted access to the meeting to present his position. Unfortunately, it did not have the desired results. The fact

that Rawhouser, pursuant to his own desires, was granted the opportunity to attempt to persuade the Board to renew his contract in a public rather than private meeting is of no significance. The essential fact is that he was granted such an opportunity. As to the second reason, the Board had twice informed Rawhouser, by letter, in complimentary language, that his services were completely satisfactory.

We have no hesitancy in stating that the proper procedure for a board to follow in giving the preliminary notice of possible non-renewal under sec. 118.22(3), Stats., is to follow the language of the statute. The instant litigation is but one example of the consequences of the failure to do so.

However, under the unusual facts of this case, it cannot be held that the failure to specifically advise Rawhouser of his right to a private meeting with the Board within five days of the receipt of the preliminary notice constitutes sufficient grounds upon which to invoke the issuance of a discretionary writ of mandamus.

■ Mandamus is a summary, drastic and extraordinary writ issued in the sound discretion of the court. Although classed as a legal remedy, mandamus is equitable in nature. Its issuance is generally controlled by equitable principles. It may issue when no other adequate remedy exists. Also, the rights of the public and third persons may be considered. *State ex rel. Sullivan v. Hauerwas,* 254 Wis. 336, 36 N.W.2d 427 (1949); *State ex rel. Joyce v. Farr,* 236 Wis. 323, 295 N.W. 21 (1940).

■ After our review of the record in this case, we reach the conclusion that the trial judge did not abuse his discretion in entering judgment denying the writ of mandamus.

*By the Court.*—Judgment affirmed.